IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 10, 2015


**STATE OF TENNESSEE v. RYAN D. BUFORD**


**Appeal from the Criminal Court for Davidson County**
**No. 2011B1815    Steve R. Dozier, Judge**

_____


**No. M2014-01265-CCA-R3-CD – Filed December 29, 2015**

_____


The defendant, Ryan D. Buford, appeals his jury convictions for first degree (felony) murder, especially aggravated robbery, a Class A felony, and tampering with evidence, a Class C felony.  The defendant asserts that the trial court erred in denying his motion to suppress his statement to police.  He also urges us to conclude that the evidence was insufficient to support his convictions because the testimony of a co-defendant was insufficiently corroborated. After a thorough review of the record, we conclude that the trial court did not err in denying the motion to suppress and that the evidence is sufficient to support the convictions, and we affirm the judgments of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Carrie A. Lowery (on appeal), Nashville, Tennessee; Kelvin D. Jones (at trial and at motion for a new trial); Elaine Heard (at trial); and Kelly D. Young (at motion to suppress) for the Appellant, Ryan D. Buford.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn Funk, District Attorney General; and Rachel Sobrero and J. Wesley King, Assistant District Attorneys General, for the Appellee, State of Tennessee.


**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The victim, Jose Martin Moya Torres, was shot to death after Tara Adcock, a co-defendant in the case, arranged to meet him for a "date" and to have him robbed by her associates, including the defendant. The defendant and the three co-defendants all gave statements to the police. In his statement, the defendant acknowledged that he was the shooter.

Prior to trial, the defendant's attorney moved to suppress his statement. The transcript of the hearing is not a part of the appellate record, but the trial court's order denying the motion summarized the testimony of the two witnesses, Detective Harold Haney and the defendant. Detective Haney testified that the defendant and co-defendant Ewing Green, IV, as well as their friend Trammell Wilson, were involved in a traffic accident as they fled police. The defendant and Mr. Green continued to flee on foot after the collision. However, the two later voluntarily appeared at the North precinct. Detective Haney testified that the defendant was advised of his rights, did not appear to be under the influence, and that he looked at, read, and signed the waiver. Detective Haney asked the defendant if he was under the influence, and the defendant replied that he had been under the influence earlier because he had "smoked a little weed." The defendant testified that he was seventeen at the time of the interview. He had been interviewed by police before. The defendant testified that at the time, he was taking Xanax "bars" and smoking marijuana habitually. He would take Xanax multiple times a day and would experience black outs, memory loss, and hallucinations. The defendant testified that he had no memory of being at the North precinct and no memory of the interview. He recalled going to school, taking Xanax, and riding in the car with his friends, and he recalled nothing else prior to waking in juvenile custody. He testified that his confession was not knowing or voluntary because he was under the influence of Xanax and marijuana. The recorded interview also reveals that Detective Haney asked the defendant at the beginning of the interview if he was shaking because he was nervous, and the defendant responded that he was anemic and cold.

The trial court concluded that the defendant's statement was knowing and voluntary. The trial court found there were no allegations of coercion and that the atmosphere of the interview was calm. The defendant was given a soda and crackers and the opportunity to have a break. The trial court found that the defendant was of above-average intelligence and able to read and write. He had been interviewed by police before and was familiar with the criminal justice system. He read and verbally acknowledged that he understood his rights. He signed the waiver. The defendant manifested concern about whether he was going to jail, the charges he would be facing, and his bond. The trial court found that "[t]he defendant was not under the influence of any intoxicants at the time of the waiver," citing the defendant's statements during the

2

interview that he was not under the influence of intoxicants but had been earlier in the day. During part of the recorded video, the defendant was left in a room with Mr. Green and Mr. Wilson. He made several incriminating statements to his friends. The trial court found that his discussion with his friends showed that he was "fully competent, and he understood the purpose of the interview."

The defendant's attorney moved to withdraw after the motion to suppress was denied. The defendant was appointed a new attorney. Apparently, relations with his new attorney also deteriorated, and the defendant's family hired an attorney close to the time of trial. Appointed and retained counsel worked together to represent the defendant at trial.

Tara Adcock was the only co-defendant to testify for the State. Ms. Adcock was charged with the same crimes as the defendant, and she testified that she had not been promised anything in exchange for her testimony, although she had been told that her truthful testimony would be "considered." She had also been presented with a "use immunity agreement," in which the State had agreed not to use any statement she made during her interview with the prosecution against her unless she testified differently during trial. Ms. Adcock testified that she was thirty-eight at the time of the crimes and had been a prostitute for thirteen years to support a crack addiction; she had numerous convictions related to drugs and theft. Ms. Adcock and her girlfriend, LaShonda Williamson, had at one point both gone through a recovery program and had not used drugs or resorted to prostitution for four years. Two months prior to the crime, Ms. Adcock and Ms. Williamson both relapsed.

Ms. Adcock testified that Mr. Green was her drug dealer at the time and that she owed him two hundred dollars on the day of the homicide. Ms. Adcock and Ms. Williamson lived in a house where numerous other people, including Mr. Green and Ms. Williamson's nephew, periodically stayed. Ms. Adcock had known Mr. Green for two months, but she only met the defendant the day before the crime. On March 28, 2011, Ms. Adcock, Ms. Williamson, Mr. Green, the defendant, Ms. Williamson's nephew, and Jeremy "Chaw" Johnson were at the house, and they were discussing "anybody that we knew that had money and drugs so we could rob them." Around 2:00 p.m., Ms. Adcock and Ms. Williamson left the house to buy crack. After making the purchase, they noticed they had a flat tire.

At this time, the victim was working at a service station about five miles from the location of the homicide. When Ms. Adcock and Ms. Williamson pulled in, the victim fixed their tire, even though they did not have any money. Ms. Adcock discussed getting in touch with the victim when he got off work "so we could have sex and I could get

3

some money." She acknowledged they did not specifically discuss money. They exchanged phone numbers.

Jose Luis Rodriguez, the owner of the service station, testified that the victim had worked there for five years. On the day of the victim's death, two women in a dark blue Buick had come to the shop with a flat tire. One of the women was Caucasian; Mr. Rodriguez later identified Ms. Adcock as the Caucasian woman. The other woman was African-American and "looked strong," "like a boy." The victim changed their tire, and they said they would return with money. They did not return, but they contacted the victim to have him change a fog light. Mr. Rodriguez intended to assist the victim in changing the fog light, but by the time the victim and Ms. Adcock made contact, Mr. Rodriguez needed to go to his second business. The victim gave Mr. Rodriguez a ride around 7:30 p.m. When the victim dropped Mr. Rodriguez off, he said he intended to go get gas in the area near the homicide. Also around this time, the victim called his uncle, Antonio Gutierrez, to say that he was going to check a car for a friend. The victim told Mr. Gutierrez that he might be slightly late to watch the 9:00 p.m. television show that the two habitually watched together.

Ms. Adcock testified that she did not intend to prostitute herself but instead intended to rob the victim. She and Ms. Williamson discussed the robbery in the car, and when she got back to the house, she told Mr. Green, the defendant, Mr. Wilson, and Ms. Williamson's nephew "that I met somebody we could rob and we'd just have to wait on him to call." She testified that they "all thought it was a good idea." Ms. Adcock testified that the defendant and Mr. Green had guns and that she had seen the guns "[a]ll day." The plan for the robbery was for the victim to follow her to a dead-end road, and then the defendant and Mr. Green "were going to run up on him."

When the victim called her, Ms. Adcock told him to meet her at a gas station so he could follow her home. Ms. Adcock was driving a gold Nissan Maxima, and she rolled down the window at the gas station and told the victim to follow her. Instead of driving to her home, however, she drove down a dead-end road nearby. She turned around at the dead-end and then parked the car. The victim parked behind her. Ms. Williamson had meanwhile driven the defendant and Mr. Green in a white car to a nearby church parking lot.

Ms. Adcock got out of the Maxima to talk to the victim, telling him to wait until the neighbors were not looking. At that point, the defendant and Mr. Green ran up. Ms. Adcock got back in her car. Through the mirror, she saw that the defendant and Mr. Green had pulled the victim out of his car and were beating and kicking him. They had guns in their hands and black bandanas around their faces. Ms. Adcock testified that she saw the defendant point his gun and fire one time. The victim got up and started to run

4

toward the back of his car. The defendant then fired another shot. Mr. Green got in the victim's car, and the defendant came into the back seat of Ms. Adcock's car. Back at the house, the defendant gave Ms. Adcock a wallet and cell phone. Mr. Green suggested burning the victim's car. Ms. Adcock, who rode in the victim's car with Mr. Green on the way to burn the car, threw the victim's possessions out of a window on the road. Ms. Williamson and the defendant drove to the same location in the white car. Mr. Green used a gas can to pour gas on top of the car and in the front seat, and he lit a fire. Afterwards, the four stopped by a hotel and, later, a tobacco store. Ms. Adcock was waiting in the car when the defendant came out of the tobacco store. She asked him "why he did the stuff he did," and he responded "that he felt better that he dreamed about it."

Ms. Adcock admitted to orchestrating the crime and doing it for financial gain. She acknowledged that it was dark during the robbery and that the defendant and Mr. Green had their faces covered. She also acknowledged having told police that she heard the shots but did not see them. Ms. Adcock admitted that she did not want her girlfriend to get into trouble and that she was barely acquainted with the defendant and had no allegiance to him. However, she testified at trial that Mr. Green and the defendant did not look alike or have the same haircut and that she was certain the shooter was the defendant. Ms. Adcock also acknowledged that she had lied to investigators numerous times.

Larry Rutter lived on the dead-end street where the victim was shot. Around 8:00 p.m., he heard three gunshots, first one and then two quickly following each other. He opened the door and saw a man lying in the street, yelling for help. The man had a gunshot wound, and when Mr. Rutter asked the man who had shot him, the man told him it was "black guys." Mr. Rutter saw two vehicles leaving as he walked out the door. One was champagne-colored. He was only able to see the tail lights of the other. Richard Prince, who also lived on the street where the victim was shot, heard three to four gunshots. He saw the victim lying on the street at the head of his driveway. The victim was rolling around and told Mr. Prince that his name was Martin. Mr. Prince's daughter-in-law called 911.

Officer Keith McNamara and Officer Gene McCollum arrived on the scene and found the victim writhing in pain. The victim told them that "two black guys" had shot him. Officer McNamara testified that the victim said he was running away and did not see the men at the time that he heard the three shots. The victim also told Officer McNamara that his mother's car, a silver Solara, had been stolen by the shooters. Officer McCollum testified that the victim stated his wallet was also taken. Area police were alerted to be on the lookout for the victim's car. Officer McCollum found three shell casings in the street.

5

Later that night, the victim died in a hospital despite efforts to save him. The medical examiner, Dr. Feng Li, testified that a bullet entered the victim's lower back near the midline, damaged a major blood vessel and the large and small intestines, as well as the spine, and exited his body through the abdomen. The victim also suffered abrasion wounds to his flanks, arms, and legs. Dr. Li concluded that the manner of death was homicide.

The next morning, Officer Joe Pennington went to an area where he knew that vehicles were sometimes abandoned. He saw the victim's car, covered in soot on the inside and partly burned. Officer Johnny Lawrence processed the vehicle at the scene. Officer Lawrence saw liquid runoff at the top of the car and was able to retrieve some fingerprints from the outside. Both men testified that video cameras in the area were not functioning at the time the car was abandoned. Detective Russell Thompson also testified that he attempted to locate video of the destruction of the car but that he was unable to do so.

Detective William Kautzman, the lead investigator, testified that a witness happened to recognize Ms. Adcock, and after Mr. Rodriguez also identified her, police went to her home on March 29, 2011. Ms. Adcock, Ms. Williamson, Ms. Williamson's nephew, and Mr. Johnson were at the home. When police first arrived, Ms. Adcock told them that she knew why they were there. She elaborated, "You're looking for the guy that shot that guy. He's inside." Lieutenant William Dyer likewise testified that Ms. Adcock was identified by an unnamed witness and that when police arrived, she said, "he's inside, he's inside." Mr. Johnson was arrested for an unrelated offense. Police searched the home pursuant to Ms. Adcock's consent. A dark blue Buick was parked at the home. Lynette Mace, who documented the scene and collected evidence, testified that one of the tires on the Buick was different from the other three. Detective Kautzman testified that several bullet casings were discovered. Ms. Mace collected six 9 millimeter casings from an area next to a shed on the property. The casings were of the same brand as the casings at the crime scene. Ms. Mace also collected a different caliber round from a trash can. A rifle which was not involved with the crimes against the victim was also collected.

Ms. Adcock and Ms. Williamson were interviewed by police several times. As a result, Detective Thompson also went on March 30, 2011, to an address where Mr. Green lived, and he brought Mr. Green in to be interviewed. Mr. Green was interviewed twice that afternoon but was released. Detective Kautzman testified that all the co-defendants initially made statements to the police that turned out not to be true.

6

Police searched the residence of Ms. Adcock and Ms. Williamson a second time on March 30, 2011. Ms. Mace testified that a box containing nineteen live rounds of 9 millimeter Winchester ammunition was discovered in a kitty litter box. One round was also found behind a couch. A plastic bag on a closet shelf had forty live rounds of 9 millimeter Winchester ammunition. Ms. Mace was able to collect fingerprints from the Winchester box.

Lieutenant Dyer testified that after Mr. Green was interviewed, the two women were interviewed again. At this point, they implicated themselves and others. Accordingly, on March 30, 2011, police were looking for a gold Nissan Maxima with temporary tags. Lieutenant Dyer observed a vehicle consistent with this description. After following the vehicle a short time, he turned on his emergency equipment. Rather than stopping, the vehicle accelerated. Eventually, it ran head-on into an SUV. The driver and front-seat passenger of the Maxima fled on foot and were able to elude officers. A third passenger, Mr. Wilson, was taken into custody. Officer Kenneth Wolfe came to collect evidence and document the scene. He testified that a 9 millimeter Smith & Wesson gun was found in the car. He acknowledged that the photographs documenting the scene reveal that two cellular phones and the temporary license plate appear to have been moved while he was still documenting the evidence.

At approximately 10:00 p.m. that evening, the defendant and Mr. Green arrived at the police station. Lieutenant Dyer testified that he recalled thinking that the clothing of the defendant and Mr. Green was consistent with the clothing of the passengers who fled the Maxima earlier in the day, particularly in that it looked tattered, as though they had run through a brushy area. Detective Haney testified that the two came to the back gate, which was a secure location. Mr. Green and the defendant were interviewed individually and together. Detective Haney testified that the defendant did not appear intoxicated. He acknowledged that the defendant stated he had smoked marijuana earlier but reiterated that the defendant "appeared to be fine." Detective Haney also stated that the defendant at one point stated he had taken Xanax, but he denied that the defendant appeared intoxicated. Initially, both the defendant and Mr. Green implicated "Chaw." A redacted video recording of the interview was played for the jury.

During the first interview, the defendant denied any involvement with the crime. In reviewing the rights waiver, the defendant spoke indistinctly as he partially read the waiver aloud. After signing it, he told police that he had heard that "Chaw" committed the crime. The defendant and Mr. Green were then interviewed together. The defendant initially denied participating in the robbery. To elicit a confession, detectives told the defendant that the burning of the Solara had been captured on video. The defendant then admitted being involved in the burning of the car, stating that he was the lookout. He eventually acknowledged being at the scene of the robbery but continued to implicate

7

"Chaw" as the shooter. The defendant stated that he saw the victim handing his possessions to "Chaw" and agreed with the suggestion that the victim ran into the path of the bullet. The defendant and Mr. Green were told that they were being charged with criminal homicide, as were Ms. Adcock and Ms. Williamson. Realizing that he would be facing homicide charges and that the charges would not change, the defendant asked, "Okay, how did we get down here?" The defendant asked officers to call his father and tell his father what was happening. During the interview, the defendant numerous times asked about his case, the charges, the type of homicide, potential sentences, his bond, and his destination in the criminal justice system. After police repeatedly urged him to show remorse and be honest, he was asked if he meant to shoot the victim or if it was to scare him, and the defendant answered, "The second one." The defendant ultimately admitted shooting twice and said he did not aim at the victim. He acknowledged having heard Ms. Adcock planning the crime. After implicating himself, the defendant asked to call his mother. After confirming that he would be charged with homicide, the defendant said, "Shoot me in my head."

At the conclusion of the joint interview, the defendant, Mr. Green, and Mr. Wilson were left alone in a room. The discussion mainly centered around the consequences which Mr. Green and the defendant might face for their actions and speculation on the fact that the two women had implicated them in the crime. Mr. Green told the defendant, "you shouldn't have shot." The defendant responded, "I didn't try to." Mr. Green then reiterated, "You already had him. He was gone. Why shoot for, man?" Mr. Green expressed his belief that he should not "even be right here." The defendant told his friends that he "tried to put it on Chaw." The three discussed the gun, and Mr. Wilson told his friends, "I threw it on the side." Mr. Green also commented that the Maxima was "the car we done everything in." In discussing the potential punishment, the defendant then said,

> Defendant: It ain't like it was up close and personal, but – you feel me – it was like, 'Boom, boom.' They know that. That's why I shouldn't have been talking around them.

> Mr. Wilson: Around who?

> Defendant: I shouldn't have never said, "I hit him."

> Mr. Green: Around Tara? … You know you hit him, though, bro. You, man.

In addition to the physical evidence collected as described above, Tommy Simpkins attempted to recover evidence from inside the burned Solara and the Maxima.

In the Solara, Officer Simpkins found latex gloves. He was able to recover some fingerprints from the Maxima and Solara and from various items inside the cars. Officer Stanley Truitt testified that police also attempted to recover evidence from a white Chevrolet. A red gas can was recovered from the back seat.

Lisa Addleman completed the fingerprint comparisons for the investigation. Ms. Addleman was given known prints from the four co-defendants, as well as the prints of Mr. Wilson, Mr. Johnson, Ms. Williamson's nephew, and the victim. Many of the fingerprints that had been retrieved as evidence were of no value. However, she was able to identify Ms. Williamson's fingerprints on the box of Winchester ammunition recovered from the kitty litter. The Maxima had fingerprints from Mr. Johnson and Mr. Green. From the victim's burnt car, she identified three fingerprints belonging to Mr. Green. Finally, she was able to identify the defendant's fingerprints on a box of condoms and on a CD, both of which were recovered from the Maxima.

The State also presented the testimony of David Kline from the city planning department. Mr. Kline testified that the gas station where the victim met Ms. Adcock, the home of Ms. Adcock, the home of Mr. Green, the crime scene, the road where the vehicle was burned, and the road where the Maxima collided with the other vehicle were all within one and a half miles of one another. Detective Kautzman testified that telephone records show that on the day of the murder, there were ten communications between the victim and Ms. Adcock, ranging in time from 4:00 p.m. to 8:01 p.m. There were also numerous telephone communications between Ms. Adcock and Mr. Green beginning on the afternoon of March 28th and going through the next morning. Detective Kautzman acknowledged that at one point, the video failed during the interviews.

The defendant attempted to show that the shooter might have been Ms. Williamson and that the other co-defendants implicated him because he was not well acquainted with them. The defense presented the testimony of Gary Wilkes, who had been at a nearby business and had witnessed Ms. Adcock and Ms. Williamson interact with the victim. Mr. Wilkes testified that Ms. Williamson "looked like a boy." The defendant also called Rodney Foster, who was a supervisor at the juvenile detention center where the defendant was housed subsequent to his confession. Mr. Foster testified that the defendant seemed "kind of high" and told him that he had taken Xanax. As a result of this communication, Mr. Foster called the nurse. The nurse instructed him to put the defendant on observation for the night, waking him every thirty to forty minutes. Mr. Foster acknowledged that the defendant was not staggering and that he was responsive. The defendant followed directions and was able to undress and shower. The defendant was "blabbering" and talking quickly, and Mr. Foster could "tell that he was high." The defendant tried to talk to Mr. Foster about why he was there, but Mr. Foster stopped him.

Mr. Green was present during trial, but the defendant ultimately elected not to call him as a witness.

The jury found the defendant guilty as charged of first degree (felony) murder, especially aggravated robbery, and tampering with evidence. The defendant was sentenced to serve life in prison for the felony murder, twenty years for the especially aggravated robbery, and four years for the tampering with evidence, all to run concurrently. After trial, the defendant's appointed counsel moved to withdraw, citing a deterioration in her relationship with the defendant. The defendant's hired counsel continued to represent him during the motion for a new trial and the filing of the notice of appeal. The trial court denied the motion for a new trial. This court waived the timely filing of the notice of appeal, trial counsel designated the record for appellate purposes, and the defendant was then appointed a fourth attorney to represent him on appeal.

## ANALYSIS

### I. Motion to Suppress

On appeal, the defendant challenges the denial of his motion to suppress his statement. The defendant suggests that the trial court erred in finding that his waiver was knowing and voluntary because he was intoxicated at the time and because, under the more severe scrutiny employed for juvenile rights waivers, the circumstances showed that the waiver was not knowing and voluntary.

A trial court's factual determinations made in deciding a motion to suppress will be upheld on appeal unless the evidence preponderates otherwise. *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012). Determinations regarding the credibility of witnesses, the weight or value of the evidence, or conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "The prevailing party in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). If the factual findings are based entirely on evidence that does not involve a credibility determination, appellate review is de novo. *State v. Moats*, 403 S.W.3d 170, 177 (Tenn. 2013). However, if the evidence involves credibility determinations in addition to videotapes or other evidence reviewable on appeal, the appellate court defers to the trial court's factual findings unless the evidence preponderates otherwise. *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003). The trial court's application of the law to the facts is reviewed de novo. *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000).

10

An appellate court may consider the entire record, including the evidence adduced at trial, in reviewing the trial court's determination regarding the suppression of the evidence. *Williamson*, 368 S.W.3d at 473. When the defendant presents additional proof relevant to a previously denied motion to suppress but does not renew the motion to suppress, however, courts have generally declined to find error on the part of the trial court in not reconsidering the motion sua sponte. *See* 6 Wayne R. LaFave, *Search and Seizure* § 11.7(d) (5th ed.); *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) ("Such evidence, however, cannot be considered by this court because it was not offered at the suppression hearing and defendant did not renew the motion to suppress at trial."); *but see State v. Henning*, 975 S.W.2d 290, 298 (Tenn. 1998) (considering evidence which was adduced at trial and favorable to the party prevailing in the motion to suppress on review but also noting that "in our view, these principles do not require an appellate court, or a trial court considering a motion for new trial, to ignore trial evidence which *reinforces or negates* the correctness of the pretrial ruling on the motion" (emphasis added)). The defendant did not move for a reconsideration of the motion to suppress after presenting the testimony of Mr. Foster at trial. We conclude that, even if we were to consider the testimony of Mr. Foster which was not offered until trial, the trial court did not err in denying the motion to suppress.

Under both the Fifth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution, the accused has a right against self-incrimination. Statements made during a custodial interrogation and without the use of procedural safeguards may not be used by the prosecution in a subsequent trial. *State v. Blackstock*, 19 S.W.3d 200, 207 (Tenn. 2000). Without "adequate protective devices … to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *State v. Climer*, 400 S.W.3d 537, 557 (Tenn. 2013) (quoting *Miranda v. Arizona*, 384 U.S. 436, 458 (1966)). *Miranda's* prophylactic safeguards "must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney." *Blackstock*, 19 S.W.3d at 207.

However, the rights afforded to the accused against self-incrimination may be waived provided the waiver is made "voluntarily, knowingly, and intelligently." *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012) (quoting *Miranda*, 384 U.S. at 479). Whether a waiver was voluntary, knowing, and intelligent is assessed under a totality of the circumstances. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997). A waiver must be voluntary in that it is the product of free choice rather than intimidation, coercion, or deception, and it must be made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. *Climer*, 400 S.W.3d at 564. The prosecution must prove waiver by a preponderance of the evidence. *Id.* In

considering voluntariness, the essential question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *State v. Downey*, 259 S.W.3d 723, 734 (Tenn. 2008) (quoting *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980)).

A juvenile's waiver of his Fifth Amendment rights is analyzed under the totality of the circumstances, in light of the following factors:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;
>
> (4) any intoxication;
>
> (5) any mental disease, disorder, or retardation; and
>
> (6) the presence of a parent, guardian, or interested adult.

*State v. Callahan*, 979 S.W.2d 577, 583 (Tenn. 1998). "While courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." *Id.*

The defendant alleges that his statement was rendered involuntary because he was a juvenile and he was intoxicated. Intoxication alone does not bar the introduction of a confession if the accused was capable of understanding his rights. *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985). Only when the intoxication has so impaired the accused that the confession cannot be considered the product of a free mind and rational intellect should it be suppressed. *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000) (appendix). The test is "whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime." *Id.*

The video of the interview reveals that the defendant told Detective Haney that he was not then under the influence of any intoxicants but that he had been under the influence earlier in the day, when he smoked marijuana. Detective Haney testified that the defendant did not appear intoxicated. The trial court found that the defendant was not intoxicated. Because the determination regarding the defendant's intoxication involves credibility determinations in addition to the video evidence reviewable by the appellate court, we do not review the trial court's determination de novo. *Garcia*, 123 S.W.3d at 343. The State asserts that a challenge to the motion to suppress is waived because the defendant failed to include a transcript of the hearing on the motion in the record on appeal. Trial counsel, in designating the record for appeal, did not include the transcript of the motion to suppress. The exhibits to the motion, consisting of two videos of the police interviews and accompanying unofficial transcripts, are part of the record, as are the findings of the trial court. We note here that the appellant has the duty to provide a transcript as necessary to permit the appellate court to conduct a review. Tenn. R. App. P. 24(b). In this case, the appellate record contains the trial court's findings of fact, the trial court's thorough summary of the evidence from the hearing on the motion to suppress, and the videos of the interviews which were introduced as exhibits at the hearing, as well as the evidence presented at trial. Generally, where the appellant fails to submit a complete record, the trial court's determinations are presumed correct. *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, in reviewing the defendant's claim, we presume that the trial court's factual findings made after hearing the evidence at the motion to suppress are correct and will uphold them unless the evidence preponderates otherwise. *Garcia*, 123 S.W.3d at 343.

In finding that the defendant was not intoxicated, the trial court noted that the defendant made coherent statements and that "he was concerned about whether he was going to jail, the charges against him, whether he would be able to post bond, and how much jail time he would be facing." The defendant told detectives that he was not under the influence but that he had been smoking marijuana earlier in the day. In the absence of a complete record, we presume that the trial court's determination that the defendant was not intoxicated is correct. Moreover, the videotaped interviews support this conclusion. Although the defendant's statements regarding the crime were mostly made in response to the questions posed to him rather than in narrative form, he appeared to be alert and cognizant when inquiring about his legal situation and the consequences of his crimes. The trial court did not err in concluding that the defendant was capable of making a narrative of past events or of stating his own participation in the crime. Mr. Foster's testimony confirmed that the defendant was capable of narrating events and that he was not so intoxicated that his confession was not the product of a free mind or rational intellect. The defendant cites *State v. Bornfriend*, alleging that the statement suppressed in that case was given under analogous circumstances in that the defendant was intoxicated. *State v. Bornfriend*, 02C01-9708-CC-00297, 1998 WL 641336, at *5 (Tenn.

13

Crim. App. Sept. 21, 1998). However, in *Bornfriend*, the trial court found that the defendant was so intoxicated that his statement was not the product of a free mind, and this court concluded that the evidence did not preponderate against that finding. *Id.* Here, on the other hand, the trial court found that the defendant was not intoxicated, and we will not disturb this finding on appeal.

The trial court also appropriately considered the other factors in *Callahan* and concluded that the defendant's waiver was knowing, voluntary, and intelligent. The trial court found that the defendant was seventeen, that he was able to read and write, that there were no language barriers, and that he possessed above-average intelligence. The trial court found that the atmosphere of the interrogation was calm,[1] that the defendant was permitted a break and refreshments, that the defendant did not suffer from any mental defects, and that the defendant's statements were coherent. The trial court did not make a finding regarding the presence of a parent, but it is apparent from the interview that a parent was not present. The defendant, after having implicated himself in the crime, asked to call his mother, but the record does not reveal if she was notified. This one factor, however, does not in itself render the confession involuntary. *Callahan*, 979 S.W.2d at 583. We conclude that the trial court did not err in denying the motion to suppress.

## II. Sufficiency of the Evidence

The defendant's sufficiency argument is in a large part premised on the invalidity of the defendant's confession. The defendant argues that, without the confession which he alleges was involuntarily made, there is no evidence to corroborate the testimony of his accomplice, Ms. Adcock.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764

---

[1] Although the defendant, in the video, claims that an injury on his head resulted from police action as he surrendered himself at the station, the defendant did not allege coercion either before the trial court or on appeal.

14

(Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The State is entitled to the strongest legitimate view of the evidence presented at trial and all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005).

The defendant was convicted of first degree (felony) murder, especially aggravated robbery, and tampering with evidence. To convict the defendant of first degree murder as charged in the indictment, the State had to prove beyond a reasonable doubt that the defendant killed the victim in the perpetration of or attempt to perpetrate robbery. T.C.A. § 39-13-202(a)(2) (2010).

To convict the defendant of especially aggravated robbery, the State had to show that the defendant committed theft from the person of the victim by violence or putting the victim in fear, that the robbery was accomplished with a deadly weapon, and that the victim suffered serious bodily injury. T.C.A. § 39-13-403(a), -401(a). Theft is committed when the defendant knowingly obtains or exercises control over property without the owner's effective consent and with the intent to deprive the owner of the property. T.C.A. § 39-14-103(a).

Finally, the defendant was convicted of tampering with evidence. Tennessee Code Annotated section 39-16-503 makes it an offense for any person, knowing that an investigation is pending or in progress, to "[a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding." T. C. A. § 39-16-503(a)(1). The jury was also charged to consider criminal responsibility. A person is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

The evidence at trial, seen in the light most favorable to the State, established that Ms. Adcock and the other co-defendants planned to rob someone to raise money for drugs. Witnesses identified Ms. Adcock as the woman who spoke with the victim at his work. Ms. Adcock testified that she had induced the victim to meet her on the dead-end road, testimony that was corroborated by telephone records. She testified that the defendant and Mr. Green ran up to the victim and began to beat him. She saw the

15

defendant shoot the victim as he attempted to run away. Mr. Green drove off in the victim's car, and the defendant gave her the victim's wallet and cell phone. Witnesses testified that the victim told them that two African-American men had committed the crimes. The four offenders later took the car to an isolated area and attempted to burn it. Mr. Green's fingerprints were recovered from the burnt vehicle. Two of the casings found on the scene were fired from the same gun that fired several bullet casings found at the home of Ms. Adcock and Ms. Williamson, and Ms. Williamson's fingerprints were recovered from a box of unused bullets found in a box of kitty litter at the home. When police attempted to stop the vehicle used in the crimes, two individuals ran away from the vehicle. Lieutenant Dyer testified that the defendant's clothing and appearance was consistent with one of the suspects who fled, and the defendant's fingerprints were found on items recovered from the car used in the crime. At the police station, the defendant confessed to his participation in the crimes, both to his friends outside the presence of police and to detectives.

The defendant argues that none of the evidence other than his confession was sufficient to corroborate Ms. Adcock's testimony that he was involved in the crime. The uncorroborated testimony of an accomplice is not, in itself, sufficient to support a conviction. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). However, only a modicum of evidence is necessary to corroborate accomplice testimony. *State v. Fusco*, 404 S.W.3d 504, 524 (Tenn. Crim. App. 2012). Sufficient corroboration may be summarized as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw,* 37 S.W.3d at 903 (quoting *State v. Bigbee,* 885 S.W.2d 797, 803 (Tenn.1994) *superseded by statute on other grounds as recognized in State v. Odom*, 137 S.W.3d 572, (Tenn. 2004)). Whether there is sufficient corroboration is a jury question. *Fusco*, 404 S.W.3d at 524.

16

In this case, the defendant's statements are sufficient to corroborate the testimony of Ms. Adcock. The defendant first admitted to police that he participated in burning the car. Later, he acknowledged that he had shot the victim, intending to scare him. The defendant's statement that he shot twice was confirmed by the physical evidence. Moreover, the defendant's statements to his friends also corroborated his role in the shooting. The defendant acknowledged his role in the crime to his friends, stating that it was not "up close and personal, but – you feel me – it was like, 'Boom, boom.'" The conversation with Mr. Green and Mr. Wilson, furthermore, did not require Fifth Amendment procedural safeguards. *See State v. Sanders*, 452 S.W.3d 300, 312 (Tenn. 2014) ("These constitutional provisions are not concerned 'with moral or psychological pressures to confess emanating from sources other than official coercion.'" (Quoting *United States v. Erving L.,* 147 F.3d 1240, 1247 (10th Cir.1998))).

A rational trier of fact could have found that the defendant and his accomplices committed felony murder when the defendant shot and killed the victim during the course of taking his wallet, phone, and car. The evidence is also sufficient to support the finding that the defendant and his accomplices robbed the victim with a deadly weapon and that the victim suffered serious bodily injury. Finally, the evidence is sufficient to support the conclusion that, when the defendant and his accomplices burned the car, they altered it with the intent to impair its availability as evidence, knowing that an official investigation was pending or in progress. Accordingly, the evidence is sufficient to support the convictions.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

17